### 9857

#### MOSELEY *ET AL.* v SMITH *ET AL.*

##### (95 S. E. 503.)

SPECIFIC PERFORMANCE—EVIDENCE—SUFFICIENCY.—Evidence *held* to show execution of a contract to make a deed to land and building, so as to warrant its specific performance, even after the death of the prospective grantors.

Before DeVore, J., Lee, Spring term, 1916. Affirmed.

Action by G. W. Mosely and others against Martha C. Smith and another.

Decree for plaintiffs and defendant, Smith, appeals.

J. W. Davis testified:

That he had been a member of the Spring Hill Lodge ever since 1877; that the lodge was moved from the old locality near Mr. Smith's store semewhere about 1906. "Q. Did the Masons build that new hall? A. They did. Q. Do you know anything about an agreement between the Masons— the lodge—and Mr. and Mrs. Smith? A. I think I ought to know, for I was on the building committee. Q. Who did you see? A. Mrs. Smith and her husband, L. A. White on committee, and W. S. Smith, chairman of it. Q. Smith had charge of building it? A. And the lodge gave us the power to do this; that was the duty of the committee. Q. He looked after the land location? A. Yes. Q. When did you see her? A. Before we touched the house a good while;

maybe two months. Q. Before you touched which house? A. Before we touched the old building to move it. Her complaint was that we should move it from there; it was near the store, about to fall over there on the store. Q. Whose complaint was that? A. Mrs. Smith's.

"L. D. Jennings: She made that complaint personally? A. Yes, personally; no one else to go to but her.

"Mr. Tatum: What did you say to her? Did Mrs. Smith— A. Mrs. Smith said, if we would move it on the hill, we could have the whole thing, and she would give us the land. * * *

"Mr. Tatum: Mr. Davis, what did you say to Mrs. Smith, and what was said to her in your presence, and what did she say? A. We were at the old lodge and talking about moving. Q. Was that before you had attacked the old building for the purpose of tearing it down? A. Yes; were in Mr. Smith's store, or her store; both there, and the conversation took place; that was about moving. * * * Q. Did Mrs. Smith afterwards put the lodge in possession of this lot? A. Mrs. Smith? Q. Yes; did she finally select a lot? A. She went and showed us herself. Q. Did you put it there? A. Yes. Q. Are you in possession of it now? A. Yes; we agreed to let her use the bottom. We did not think any use to get— Q. Now, tell what conversation you had with Mrs. Smith about the transaction. A. Said she— * * * Q. Exactly what she said? A. She said she would give us one-half acre and fill out that deed. We could go ahead with that assurance, and her husband sanctioned it. Q. What were you to do? A. We were vested with power of committee; only her husband acted instead. Just to get clear of the building. Q. What were you to do for her to give you the lot of land? A. We were to put up the house. Q. The old building? A. No; we were to build over. Q. Did you attend to your part? A. Yes. Q. Was that part of the agreement? A. Yes; take it out of the way, and what we did not want we left it there, and I do not know

what became of it. Q. Did Mrs. Smith say she would give title to that land? A. Yes; whenever we got the lodge out, any time. Q. Do you remember that? A. Yes; we would not have agreed, if not that way. She wanted that old building moved. Q. Anything said to the members? A. Yes; insurance on the store would be less if the old building removed. Q. And Mrs. Smith said she would give you title to this property? A. Yes, and wanted to choose it herself. Q. Did you go out, and she went with you, to select the place? A. Yes; went up and pointed out the place where to put it. Q. Have any difficult in selecting a place? A. No; none in the world. Q. Who was along in the party? A. L. A. White, W. S. Smith, balance of the crowd along. Committee composed of L. W. White, J. W. Weldon, and W. S. Smith. Q. Who selected the spot? A. Mrs. Martha Smith. Q. How much to be? A. One-half acre lot, a good one-half acre, because it was near a large walnut tree and made a nice shade. Q. It was alleged in the answer you were to move this building in order to get the use of the upper story? A. I heard nothing about that. Q. That is what Mrs. Smith alleges—move the building, and have the use of the upper story and ingress and egress to the upper story. And the lodge built it, and are to have one-half acre around there? A. Mr. Smith said the lodge coud— * * * Q. You say the lodge executed this contract? A. Yes. Q. Why did you move the building? A. To rebuild another on this site of land. Q. And you are now in possession of it under that contract? A. Yes. Q. And still in possession of it under that contract? Did you call upon Mrs. Smith to execute a deed? A. We did; appointed a committee. Q. Appointed a committee? A. I was one, but was sick and could not go. L. A. White and T. L. Cole on the committee. Q. You do not know what the committee did? A. No. Q. You remember what that building cost? A. I do not. Q. Have you got a deed for it; I mean to the new one? A. No. Q. You know you have not got one? A. Yes; I

know we have not got one.   Q. Have you talked with Mrs. Smith about it lately?   A. No; have not.   Q. This is the lot which Mrs. Smith conducted you to and pointed out and you afterwards took possession?   (Reads description.) A. That is correct.   Q. Mr. Davis, was Mrs. Smith to give you a straight title for this land or just for a term of years? A. She was to give it straight.   Q. No conditions?   A. No; we do not want it that way.   Q. The title was to be absolutely fee simple?   A. Yes; in other words, we would not have had it any other way.   Q. Anything else, Mr. Davis, that you know of?   A. No."

Cross-Examination:

"Q. I believe you say you would not have had it any way, except a straight title?   A. No.   Q. That is all you had in the old lodge.   You did not give her any consideration to get a new title to a new piece of land?   A. No.   Q. Why was any one to give you a title?   A. Just what I say; the old lodge turning over I suppose was the reason, and another reason the fire insurance and horses and buggies around there.   Q. And the old lodge in a tumble-down condition? A. Yes.   Q. Unfit for use?   A. I did not say that.   Q. Did you say the building was leaning over?   A. Yes; the pillars giving away.   Q. Did that make the upper part dangerous?   A. Yes; I suppose you would call it dangerous. Q. It was dangerous to use the building in that condition? A. Yes.   Q. And the lodge, even if she had not consented to this title arrangement that you speak about, would have had to repair the building at least where it was?   A. Mr. Smith would have to repair; once or twice L. W. Smith repaired it.   Q. Suppose he had not done it.   In order for the lodge to use it along, would have had to do it?   A. Yes; I suppose so.   Q. How far was the lodge located, the old lodge, from the store at the time you moved it?   A. I do not think more than about, not over, 15 or 20 feet—sideways.   Q. Not over 15 or 20 feet?   How about long ways?   A. About 15 or 20 feet somewhere along there.   Q. How tall was the

building? A. The store was standing there. Q. I mean the lodge—the building—the Masonic lodge up on the hillside? A. I suppose over that side 30 or 40 feet high. Q. Now, who started the movement to move the building? How did it come up? A. Mrs. Smith was the first I heard speak about it. Q. What did you hear her say? A. What I heard her say was she would be glad if it was moved away from there, a month or two months before I heard anything; certainly dangerous for her and Willie to be in it, and fire insurance could be got rid of.

"Q. Why did you all not get a title to the lot before you tore that old building down? A. The reason of that was her husband was chairman of the committee and he promised us to get it. Q. Do not say what he said. I am asking you of your own knowledge. He was chairman of the committee? A. Yes. Q. Do not state what he said—do you know whether or not—why he did not get it from her before? A. I can only tell you what he said; do not know. Q. Whatever he stated to you, he stated to you what she said before you tore the old building down? A. Yes, and then afterwards, too. Q. Before and after? A. Yes. Q. When was it you authorized the committee to get the title? A. Could not tell exactly; about eight or nine years. Which committee did you mean? Q. The last one? A. About three or four months. Q. From the time the building put up there in 1906 until three or four months ago, why did you not go and demand a title from her during that time? A. We had demanded it through this committee, then through her husband. On the minutes of the lodge, if we had— Q. She would not give it? A. No; he asked for further time. He was secretary of the lodge. Q. And the material that came out of the old building, what was done with it? A. I suppose Mrs. Smith had it burned; and she wanted some of it used in the building, for I seen it in the building. Q. What portion used in the new building? A. You mean joists, etc.? Q. All that was fit for use? A. I

do not know; do not think all. We turned it over to him; whatever he saw fit to do. Q. Now, that was in 1906, about nine or eight years ago. Now, during all that time who has used the lower story of this new building? A. Mr. Smith. We let him have it. We had no use for it. Q. Who has used it since his death? A. I do not know who used it. I have seen negroes and whites passing it. Do not know. Q. Since the new building erected, has the lodge used anything other than the upper story, just like the old building? A. Do not think so. Q. So, then, you were using the new building just the same manner as the old? A. Certainly we granted it.

"Q. Mr. Davis, you remember about a year ago asking Mrs. Smith's permission to put up a hitching post there? A. Yes; she asked us— Q. I say, do you remember asking her permission to put up a hitching post? A. She requested it, on account of the horses going on the other side, not letting the horses all get loose—even done that when at the old lodge— Q. You knew the terms of the old arrangement; the old contract? A. No; never saw it until now. Q. You did not know the first lodge hall was used under a 99-year lease, simply the use of the upper story? A. No. Q. You had never heard the lease until today? A. No. Q. At the time you moved the old building and built the new one, you thought they had a title to the original place or lot? A. No, I did not; was told we did not have. Mr. L. W. Smith, the man who gave it. Q. You understand he had given the old lot to be used by them only, and suggested the new for them; that Mrs. Smith wanted to change the old spot for the new? A. No; she was to give it; no changing about it. Q. What reason that she wanted to give it? A. I do not know. I suppose to get shut of the lodge and men, as I told you a while ago; noise. Q. And you say substantially made the fire insurance higher? A. Yes. Q. Then why would she or her husband say that when subsequently she has never had fire insurance on building or stock of goods?

A. I do not know anything about that. I do not know if she ever owned any goods. Q. So you think you were mistaken when one of the reasons were that it would lessen the insurance on store and stock of goods? A. I suppose so; that is what she said. Q. Suppose she had never had any insurance; would you not think you were mistaken? A. No. Q. That has been about 14 years go? A. No; when I hear anything I am not apt to forget? Q. You can remember what happened 14 years ago? A. No, not distinctly; but where it has been one year can call back my mind to it. Every spring we demanded title, and she never would give it after she had agreed that she would do it. You want me to tell that? Her husband was afflicted, and I— Q. Don't say what you asked her husband. What did you ask her? What did she tell you? A. We made him chairman of the committee, and had to go to him. Q. And you do not know what passed between him and her? A. No. Q. Do you know—is that what she agreed with them? If you would move the building she would give you title to it? A. Yes. Q. And you never talked with her? A. No. Q. And never knew why she did not execute title? A. Not until lately."

Redirect:

"Q. Do you know why Mrs. Smith would not execute title of your own knowledge? A. Not of my own knowledge. Q. You say Mr. W. S. Smith was chairman of committee? A. Yes. Q. Did you have several talks with him about it? A. Yes; hundreds. Q. You know what he said? A. Yes. Q. You reported to the lodge? A. Yes; he would ask the lodge for further time to get this title. All know this. * * * Q. He would make reports to lodge? A. Yes; many times. Q. And he had charge of the matter? A. Yes; he did, even paid off the builders all the money. Q. He paid the builders? A. Yes. Q. How much? Do you remember? A. I do not remember exactly the very amount. Q. You do not know whether they had fire insurance or not? A. No. Q. You do not know whether they had fire insur-

ance? A. That is all I know; what they said. Q. What is the value of land up there? About what is the value of lot of land at the time you got it? A. I can only tell you what is turned in for taxes. It is mighty poor, but they value it high, but mighty poor land. Q. What did you value at that time? A. I would $10 or $12. Q. For one acre? A. Yes. Q. At that time? A. Yes. Q. You do not know exactly what year; has not been 14 years, has it? A. No; not that long? Q. How far is this building from the store? A. Somewhere between 300 and 400 yards? Q. All members of the lodge live several miles? A. Yes; I live five; some of them live seven or eight and ten. Q. When coming to the lodge meetings, did you always ride? A. Yes; in buggies. Q. Where did you hitch? A. Anywhere we could get. Q. When at the old lodge? A. Yes; at trees wherever we could get. Q. You say Mr. W. S. Smith used the lower floor of the building? A. Yes. Q. Was that with permission of the lodge? A. He asked several times— * * * Q. I just want to know if that was with permission of the lodge? A. Yes."

L. A. White testified as follows:

"Q. Mr. White, are you a member of Spring Hill Lodge No. 188, Ancient Order of Free Masons? A. Yes. Q. How long? A. Since January, 1878. Q. Were you a member of the lodge at the time that building now occupied by your lodge was erected? You were a member at that time? A. Yes. Q. Previous, Mr. White, to your moving to your present quarters, where was your place of meeting? A. Near Mr. Smith's store. Q. Near Mr. Smith's store? A. Yes. Q. In the upper story of the building? A. In the upper story of the building. Q. Why did you move, or why was there any disposition on the part of the lodge to move its quarters? * * * A. The lodge needed some repairs. Q. Was there any other reason? A. Mr. Smith made us an offer; he thought a good one. Q. Did you want to move, or was it the desire of others interested that you moved? A.

12—109.

The lodge had no disposition at all to move. Q. Who did want the move? A. W. S. Smith. Q. The husband of Mrs. Martha C. Smith? A. Yes. Q. Was he a member of the lodge? A. Yes. Q. Did he own the store—did he occupy as a store the building near the lodge? A. Yes. Q. Were you present when the action was taken in the lodge whereby it was decided to build another place, to move? A. I was present. Q. I wish you would state what transpired.

"Mr. Harby: That may be in the minutes.

"Mr. McLeod: I will get the book.

"Q. The present secretary is Mr. Hatfield; who preceded him as secretary? A. C. L. Kirkley. Q. Who preceded C. L. Kirkley? A. W. S. Smith. Q. Was W. S. Smith secretary at the time of— A. Yes. Q. Did Mr. Kirkley take his place immediately; that is, at the following meeting after Mr. Smith's death? A. Yes; he filled the place several times before Mr. Smith's death. Q. There was no intervening secretary between Smith and Kirkley? A. None at all. Q. Do you know whether or not Mr. Smith's lodge papers were turned over by Mr. Smith to Mr. Kirkley? A. I do not know. Q. Do you know of any demand being made on Kirkley for these lodge papers? A. I made demand on him. Q. What did he say about these minutes? * * * Q. What did he say about the minutes? A. He said he knew nothing of the minutes. Q. Did you get the minutes from Kirkley? A. I did. Q. Did you get all? A. got those that I demanded—1905 and 1906. Q. I am talking about the original minutes, adopted by the lodge; do not mean the books; I mean the minutes. A. The minutes did not read like the minutes adopted by the lodge. Q. That is the point. Did you get the minutes that were adopted by the lodge? A. I could only say that they were not exactly the same minutes as adopted by the lodge. Q. Not the same minutes? A. No.

"Q. You say you were a member of the lodge at the time that it was decided to make this move. Now, I will ask

you to go back over that. Why was it that you were to move the lodge, or why did you move? At whose request, and upon whose proposition? A. W. S. Smith. Q. Was a committee appointed? A. A committee was appointed. Q. Who was it? A. W. S. Smith, J. W. Davis, and L. A. White. Q. What did you do? A. We were authorized by the Masons to locate the spot and make contract to move the lodge; tear the lodge down, and use such timbers as they needed, which was given by Mr. Smith. The lower floor was his of the old building, and relinquished all claims to it. Q. Did you see Mr. Smith in regard to another lot? A. The committee met Mr. Smith, and I was a member of that committee. Q. Then tell what happened. A. We told him the committee had met for the purpose of locating a spot and a lot on which to build the lodge. He said he would call his wife. Q. That was Mrs. M. C. Smith? A. Yes.

"Mr. Harby: He said he would do what? A. Call his wife. Q. Did he call her? A. Yes. Q. Who did you mean by 'we?' A. The committee; the three, W. S. Smith, J. W. Davis, and myself. Q. Did Mrs. Smith go with you? A. Yes. Q. Mrs. M. C. Smith? A. Yes. Q. What did you do? A. We went where we understood he was to give one-half acre of land. Mrs. Smith objected. Q. What objection did Mrs. Smith raise? A. For some reason that it was too near her dweling house, interrupted her; then did not want so near Mrs. C. L. Kirkley's house to interrupt her. Q. What did you do, then, after she objected to that lot? A. We selected another. Q. What about that one? A. She said that would be in front of her building; cut her view off from the public road. Q. Then what happened? A. We asked where would suit her. Q. What did she say? A. She said right over there on the other side of the road, and we accepted it. Q. Accepted that lot? A. Yes; Mr. Smith stepped it off. Q. Now, Mr. White and you all built on that lot? A. Built on that lot. Q. See if this is a proper description of the lot. I will read it to you. * * * Q. Did

you afterwards build upon this lot? A. We did. Q. Was it one-half acre? A. One-half acre; yes.

"Q. Who did you understand held the title to it at the time? * * * Q. Do you know who owned it? * * * A. I knew it was W. S. Smith's property. Q. W. S. Smith or M. C. Smith? A. And that the titles were in Mrs. Smith's name. I knew that in Mrs. Smith's name, or Mrs. Smith thought it was her property at that time. Q. Was she there objecting to different locations and agreeing to others? A. Yes. Q. Were you all to ask titles to this lot from Mrs. Smith? A. No. Q. Who was to do that? A. W. S. Smith. Q. That was intrusted to him? A. Yes. Q. When was it that you found out that title had not been procured by him? A. We found it out before his death. Q. Shortly before his death? A. Yes. Q. While you were at that lot, was anything said, Mr. White, about the kind of building that was going— * * * Q. What was said by Mrs. Smith in regard to that lot, the use of it, if anything? A. I said to some of the members that was around that we would build this house with an eye to using the lower floor as a storehouse; the Masons could use or rent out at will. Mrs. Smith said, 'No, the ground floor will be mine.' I said Mr. Smith relinquished all claims to the land, and the Masons are going to build it, and it will be theirs from the bottom floor up. Q. You told her she would have no claim to this part at all? A. No claim at all. Q. Did she make any further objection after that statement? A. She did not.

"Q. Did you actually erect a building? A. And actually erected a building. Q. Who erected the building? A. You mean who was the contractor? Q. No; who paid for it? A. The Masons. Q. Did Mr. Smith contribute towards it, other than as a Mason? A. No; Mr. Smith, in his offer, offered to give as much or more than any other Mason. Q. The Masons were taxed; the tax levied on Mr. Smith just as on the others? A. Yes. Q. And he did contribute largely? A. As I remember now, the worshipful master gave $50 and

W. S. Smith gave $50.   Q. As Masons?   A. Just as Masons.
Two years afterwards Mr. Smith, secretary of the lodge, got
up and made a move that each member receive 40 per cent.
of the money paid into the lodge.   As the money was in·
the treasury, it was drawn out of the treasury, and each one
received 40 per cent. of what he had put in.   About two
years more, and 60 per cent. was paid in.   We got every cent
we put in.   Q. You got the money back that you put in?
A. Yes.   Q. And so did the others?   A. Yes; I think every
man got— ˙ Q. So what every man advanced was paid back
by regular assessment of the lodge?   A. Yes.   Q. Well,
then, did W. S. Smith individually, after the explanation
you have made, contribute anything to this lodge?   A
Nothing at all.

"Q. Mr. Smith did use the lower floor of that building
that was erected?   A. For some while it was not used at
all.   Q. Some while after it was built, not used at all?   A.
Yes.   Q. Then how did it come to be used?   A. Mr. Smith
asked in the lodge, as we were not using it, might 'he use it
just as— * * * Q. Use it for what purpose?   A. For
storehouse.   Q. How long after it was built was this request
made by him?   A. I do not remember exactly; I suppose a
year or a little more.   Q. Then how long did he use it as a
warehouse?   Did the lodge agree for him to use it that
way?   A. Yes.   Q. How long did he continue to use in that
manner?   A. Three or four years.   Q. At his death was he
using it?   A. He was.   Q. Was he using it with the consent
and permission of the lodge?   A. He was.   Q. Since his
death how has it been used?   A. For the same purpose, as
a warehouse in connection with his business—C. L. Kirk-
ley's business.   Q. Who did C. L. Kirkley succeed in busi-
ness?   A. W. S. Smith.   Q. Did he buy out the stock of
goods?   A. Bought out his stock of goods.   Q. Who is
using it now?   A. It is not in use now at all; the Masons
have possession of it.   Q. The Masons have possession of
it.   Mr. White, prior to the commencement of this action,

did you or did you not, as the committee from the lodge, make demand upon Mrs. M. C. Smith for title? A. I did. Q. Who was on the committee with you? A. Mr. Cole, J. W. Davis and myself.

"Q. Did she refuse to give you title? A. She refused to give title. Q. Mr. White, when you decided to make this move and give up your former building, and move to a different place, what was the agreement as to title you were to receive? A. Mr. Smith was to give us title. Q. What kind of title? Were you to get a fee simple title? A. A fee simple title. Q. Who was that title to be made by? Who was to execute the title? A. As a matter of fact, we knew that Mrs. Smith would have to execute the title. Q. Did Mr. W. S. Smith—did he say he would get a fee simple title from his wife? * * * Q. And when you went to this lot and agreed to accept it, both Mr. Smith and Mrs. Smith were present? A. Both were present. Q. Who tended to Mrs. M. C. Smith's business at the time of this— her general business? A. W. S. Smith. She was not known in the business. Q. In the general business who tended to the business? A. Her husband. Q. When anybody, yourself or any others of whom you know, wanted to buy any property, or did buy any, which was in Mrs. Smith's name, whom did they deal with? * * * Q. Mr. White, was this agreement about another lot, and the kind of title which was to be made to it, made before the lot was selected, or afterwards? A. We had selected the lot. You have reference to another lot? Q. I am talking about the agreement as to what was to be done in case you did. Was that agreement before or after the lot was actually selected by you and Mrs. Smith? A. The agreement was made before any selections. * * *

"Q. Did Mrs. Smith, when you made demand on her for title prior to the commencement of this action—what did Mrs. Smith say was her reason for refusing title? What did she say? A. She said a great deal. Q. Did she give

any special reason why she would not do it? A. Because of certain persons that held their membership there. Q. Who were those persons—just as well talk out in the meeting? A. She seemed to have it in for a good many; Hatfield, Shiver, and all the Pisgahmits. Q. Rather personal then, was it? A. Yes. * * * Q. What else did she say? A. You will have to call on her. Q. I want to know what she said. A. I do not know that I could remember one-tenth of what she said. Q. What other reason did she give for not making a title? A. She assigned so many reasons I do not know where to commence; afraid you might go to objecting. If you promise not to object. Q. I cannot make any promises. Do the best you can. I know Mrs. Smith. You cannot tell me everything she said, but tell me the substance. A. She laid claims to the building that W. S. Smith gave the lodge. I said, 'Mrs. Smith, I do not believe one word, and it is absolutely not so that he had any interest at all in it, only as a Mason contributing his part, paying his tax, and all of it has been given back.' She says, 'I know better than that.' I went to Kirkley, and demanded the minutes of 1905 and 1906, and we ran over them hurriedly, getting out such information as was absolutely necessary, as we thought, so as we could convince her of the fact that Mr. Smith had no rights nor claims in the building. Then she asked why was it that we allowed him to use it. We told her that he did it by consent of the lodge; he got that consent. Then she said, 'Why not take it? Because it was the way of the world to get what they could, and I am going to do everything I can; everybody gets out of me, and I am going to get out of them.' I said, 'Mrs. Smith, I did not know you were like that.' She said she had made up in her mind to get that which she could get. I said, 'You will never remember of getting that lodge; we are going to get it, and I would rather it be on easier terms.' She says, 'It is that damn Hatfield; that is who it is.' She had some disagreement with Mr. Hatfield. She paid her respect to Mr. Hatfield.

Q. Did she not say she had made an agreement to give title, but she was not going to do it? Did she say that? Did she say anything about agreement to give title? A. I had no agreement with her. Q. She had no agreement with you to give title? A. No; I went to her to get an agreement with her to give title, but she did not agree.

"Q. At the time that you all moved, you had no agreement with her about title? A. I never said anything about title. I was not authorized to get the title. Q. When was this time that you and Brother Cole and Brother Davis went to demand deed? A. When was that? I think it was last— Q. Just a short while before this suit started? A. Yes; just a short while. Q. This paper was served on July 11, 1914. It was some time in the summer of 1914? A. It was in June. Q. June, 1914? A. Yes. Q. You said in the complaint that you found you did not have the deed to the land before Mrs. W. S. Smith died? A. Yes. Q. Well, what did you do about getting it then—found out, and then made this demand? A. We had been going along. Q. Did you make any other demand? This the first time you asked about it? A. That was the first time. She had told me, about a month before, that she had missed a sale with Mr. Osteen.

"Q. Mr. White, you said you were a member of Lodge No. 188, Ancient Order of Free Masons, A. O. F. M., is that correct? A. A. O. F. M.; that is some of your new orders. Q. That is what Mr. McLeod asked? A. I am a member of Ancient Order of Free Masons. Q. Or a member of Free and Accepted Masons, F. and A. M.? Maybe you got the names confused. We call it F. and A. M.

"Mr. McLeod: I think the proper thing is Ancient Order of Free Masons, if you want to know.

"Q. What was the condition of your lodge room just before the move—what sort of building, roof, etc.? A. In bad condition; needed repairs. Q. Roof leaked? A. I do not remember; never noticed what repairs it did need.

Needed some underpinning; some of the sills had kind of given away, given a little. Q. It was in such condition that if something was not done to it soon— A. Something was going to be done soon. We had realized that, and we were going at it. Q. You either had to repair this building or get a new one? A. Yes; one or the other. Q. So the lodge was ready to consider any proposition whereby it could get a new building? You all wanted a proposition to get a new building? A. We did not care whether new or same one repaired. Q. Absolutely had no choice? A. No; I did not, and I can voice the sentiment of the lodge.

"Q. Was Mr. Kirkley secretary of the lodge before or after Mr. Smith's death, do you recall? A. He filled it for some time. Mr. Smith's health failed him; he filled the office. Q. He acted as secretary? A. He acted as secretary *pro tem.* Q. When actually installed? A. I think about December? Q. In December, before Mr. Smith's death in March? December, before Mr. Smith's death in March? A. I do not remember about that; I expect so. Q. After you found out that you did not have title to the property, how did it happen that you did not ask Mr. Smith for the minutes before his death? A. We had intrusted all the building to Mr. Smith. Q. And you did not say anything to Mr. Smith before he died? A. Not a thing. Q. when Mr. Kirkley turned over certain papers to you, he said they were the minutes. In what shape were they—written in a book, or loose sheets of paper? A. Written in a book. Q. Do you know where the book is now? A. Have not seen it since. Q. Did you take it from Mr. Kirkley? A. Left it on his desk. Q. Whose handwriting were they written in? A. W. S. Smith's. Q. Signed by him as secretary? A. What we were looking for was written by W. S. Smith. I never examined back any farther. Q. Who was master in the lodge at that time? A. J. W. Moseley. Q. Had he signed these minutes? A. I never looked to see whether signed or not.

"Q. So, when you said those were not the official minutes, you were just going by your recollection of the official minutes? A. I remember being on the building committee. Q. You were just going by recollection? Did not look to see if Moseley had signed? A. I just want to say that I would make recordations from meeting to meeting, to see if report recorded as I had given it. Q. You did not look to see if Moseley had signed? A. No, I did not; just looking for certain things, and when I found them went on. Q. Did the book have the appearance of being the old book? A. Yes; it looked like the old book. Q. How far back did it run—behind 1905? A. I do not remember looking back for only 1905. Q. What part of the book was that, middle or back part? A. I do not remember. Q. Do you remember the appearance of the book that minutes kept in in 1905? What did the book look like? A. No; I did not have any use for the minutes, only just that one time.

"Q. Mr. W. S. Smith paid just as much toward the lodge as anybody else did? A. Yes. Q. When he got his money back, everybody else got his back, too? A. All got it back. Q. When you and Mr. Smith and the other gentlemen on the committee located that lot, what was your idea in getting Mrs. Smith there? Why did you want Mrs. Smith there? A. I did not want her there. Q. Did any of the others want her there? A. I do not think anybody wanted her there, except W. S. Smith. Q. And do you know why he wanted her? A. I have got my idea of why he wanted her; but, as for knowing, why I do not know. Q. Is it not a fact that he wanted her because the property was hers? A. I know why I wanted her to be— Q. That has nothing to do with this. A. I am just telling you why I wanted—I suppose Mr. Smith wanted her, so as to keep out of a row with her. Q. Mrs. Smith is not here. I do not know anything about rowing with her, but at least Mr. Smith was very careful to have her there? A. He called her. Q. And you consulted her wishes in the matter? A. I only consulted her and did

what I was authorized by the lodge. Q. You put it where she wanted it? A. I had that to do. Q. You had that to do, because the property was hers, and just built it where she authorized. I am sorry Mrs. Smith is not here. She could speak for herself. Mrs. Smith said more than the ground floor would be hers? A. That is what she said. Q. When was that, before the building put up or when? A. That was before, while Mr. Smith stepping off the land. Q. She said the land would be hers? A. I informed her of the fact that it would not be. Q. What did she say then? A. I do not know what all she did say. Q. Did she agree? A. We agreed that it would not be hers. Q. Did not ask her consent? A. No; not about that. Q. Did not care whether the lodge had it or not? A. I was sure the lodge would have it. Q. You did not care whether the lodge had her consent or not? A. All we wanted was the title Mr. Smith had promised to give. Q. You did not care whether she agreed or not? A. No; I did not care.

"Q. Were you personally present when Mr. Smith talked to his wife about this title? A. No. Q. Do you know if he ever talked to her? A. I do not. Q. Did she ever tell you he had talked to her about it? A. I believe she said something about what Willie told her that evening I was out there; do not remember what it was. Q. At the time that you all located this particular lot, Mrs. Smith was attending to her own business? A. No; she was not known in the business world at all. Q. Was she not there? A. She considered that her domain; affairs around the house. She was in the business world; but, so far as attending to business, she did not tend to any. Q. She was in the business world, so far as pointing out what lot you were to have, was she not? A. She pointed out what lot, and Bill Smith had to agree, and the rest of us did, too.

"Q. When the new building put up, was it put up before the old torn down, or afterwards? A. The old one torn down, and what stuff could be was used in the new building.

Q. How much old stuff thrown away? A. Do not know. Q. How much of it? A. I do not know. Q. Practically all the old stuff used in the new building? A. I do not think much of it good for anything. Q. Do you know about how much old stuff used, one-half or one-fourth? A. I do not say how much; what was any account was used, and that not much account was not used. Q. Weatherboarding in good condition? A. No; weatherboarding no account. Q. what about the framing? A. Some of the framing I expect was good, but I do not think very much of it used. Q. what about the sills? A. They may have used the sills. Q. Did you pay anybody anything for that? A. No; that was given.

"Q. Before your building torn down, what claim did the lodge have in it? A. Had a lease of 99 years. Q. From whom? A. L. M. Smith. Q. What relation was he to W. S. Smith and wife? A. Brother. Q. Did he, when he was alive, also own the other property where the lodge building is now erected? A. Yes; he owned it at the time of his death; did not own it at the time the lodge was built. Q. Mr. White, I think it is this paper that I have here, the original complaint, says this: (Reads paragraph III of the complaint.) This paper says that you owned the lodge hall. As a matter of fact you had a lease for 99 years? A. Yes.

"Q. Whatever Mr. W. S. Smith got out of the old building was not any account? A. I do not think so, he may have built some chicken coops around the store. Q. So, what good did it do the Smiths to move the lodge? What did they get out of it? A. We got away from them, where it had been annoying them at night. We always met there for banquets and entertainments and good times. They said they could not sleep; interrupted them; wanted it off. Q. That is what Mr. W. S. Smith said? A. Yes; W. S. Smith claimed it had increased the insurance on his store, the store being so near. We did not build the lodge near his store, but he moved his store close to the lodge.

"Q. This complaint says, Mr. White, that at the time you moved the lodge Mrs. Smith—Mrs. M. C. Smith—entered into an agreement with the lodge and agreed to give them a deed to one-half acre you moved on; is that correct? A. That Mrs. Smith? Q. Yes. A. If she did, it was through W. S. Smith. Q. You did not know that she ever agreed to any such thing? A. Not of my own knowledge. Q. Did W. S. Smith say that she did? A. I do not know that he ever brought her name up. I never heard it. Q. You were there, a member of the committee, and attended to it all? A. Yes. · Q. In our answer we say that Mrs. Smith agreed to let this lease given by her brother-in-law attach to the new building in place of the old. That is what she says she agreed to, and what W. S. Smith agreed to and what she agreed to. So far as you know— A. I do not know what she agreed to. Q. I say so far as you know? A. ·So far as I know. * * *

"Q. Mr. White, could you have repaired the old building for your purposes cheaper than to have erected a new one? A. Yes; we could have repaired the old building for about one-fourth of the cost to build a new one. Q. Was the old building as to location as convenient for your purposes as the new one? A. Just as convenient. Q. Who is in possession of the premises upon which the old building was located? A. Mrs. M. C. Smith. Q. Did you tie any strings to the old property? You released and turned over to her absolutely? A. Yes. Q. Do not claim at all? A. No. Q. I believe you say that you told Mrs. Smith at the time that this property was to be absolutely yours? A. I did. Q. Did she object to your putting the lodge up after you told her it was to be absolutely the property of the lodge? A. She did not. Q. Did you ever at any time offer for her to have any kind of possession of that lodge property? For Mrs. Smith to have any kind of possession or right to that property? A. No. Q. Was not this very near where she was living, where Mrs. Smith was living; I mean in sight of

it?  A. I suppose in sight; I think so.  Q. Was she not living where she could see this building and know it was being erected?  A. Yes.  Q. Do you know of her ever having made any objection to the location of the building?  A. None at all.

"Q. Mr. White, as a matter of fact, did not the lodge at various times call upon Mr. Smith for this title? * * * Q. Do you know whether he was ever called on for title?  A. Yes.  Q. He was?  A. Yes.  Q. What did he say he would do? * * * A. He said next time he went to Sumter he would have it fixed.  Q. The next time he went to Sumter he would have it fixed?  How often did that occur up to the time of his death?  A. Twice to my knowledge.  Q. The last time; how near to his death was it mentioned the last time?  Q. I suppose about two years.  Q. Two years?  A. Yes.  Q. Was he in bad health some time before he died?  A. Yes.  Q. This was put off by him from time to time?  A. Yes.

"Q. Mr. White, do you know what was contained in the official minutes of the lodge?  A. I do not; I only looked— Q. I'm not talking about the notes—what was actually adopted by the lodge as the minutes?  A. There is some things I know; could not tell, for that I was not concerned about.  I wanted to see the report I made to the lodge from time to time—see if it was recorded in the minutes just as I had made the report to the lodge.  It was not..  Q. What was the report? * * * Q. Who made the minutes?  Who was secretary?  A. W. S. Smith.  Q. And it was not— these reports were not—in the minutes?  A. Not the reports that I would make to the lodge.  Q. What were those reports? * * * A. The reports that I would make from time to time.  Q. Can you recall these reports?  Were they written?  A. No; verbal reports.

"Mr. Harby: Do you know if your verbal reports ever put in minutes of the lodge?  A. I do not.  Q. When did you call on Mr. Smith the first time for the title?  A. That would be guess work; I do not know.  Q. You said the last

time was two years before his death? A. I guessed that; may have been one year before his death. Q. You guessed that; guess this for me. A. It was some time in 1907. Q. Shortly after the new lodge was built? A. About a year after the new lodge was built. Q. So you knew you did not have a title a year after the lodge was built? A. I knew I had his promise, which I considered as good as the title. I never doubted that promise for one moment until his health failed him, and then I began to get a little weak on the subject. Q. Mr. McLeod asked you if you had any agreement with Mrs. Smith that she was to use any part of the building. As a matter of fact you had no agreement with Mrs. Smith about anything? A. No; I had no agreement. Q. When you told her you would have the lower floor of the lodge, did you say anything about the lot—did you tell her you were to have the lot, too? A. Yes; I told her this would be the Masons' establishment. Q. The lot and the building thereon? A. I did not get out there and work myself to build a lot for her."

The decree below was as follows:

"This action is for specific performance of the contract alleged in the complaint as amended by the referee, which amendment was proper, in my opinion, although objected to by defendants. Mrs. Martha C. Smith in her answer denies that there was such a contract entered into between the plaintiffs and herself or between plaintiffs and her husband acting for her. The defendant, Kirkley, does not answer, according to the record before me. I have read very carefully all the testimony in the case, as well as the able arguments of the attorneys, pro and con. After all that has been said in the arguments, according to my view of the case, the main and I may say the only question in the case is: Was there such a contract as is alleged, and did the plaintiffs perform their part of same, so as to take it out of the statutes of frauds?

"The testimony of J. W. Davis and L. A. White is amply sufficient to enable me to find, as a matter of fact, that there was such a contract entered into betwen the plaintiffs and Mrs. M. C. Smith; and even if I am in error in this finding, the evidence is amply sufficient to show that such a contract between the plaintiffs and the defendant, M. C. Smith, was entered into by her husband, acting for her as her agent and well known to her, consented to and approved by her.   While it is not necessary to go into details in discussing the testimony, yet, after reading it all, the conclusion that there was such a contract entered into, and that the plaintiffs performed their part hereof, is irresistible.

"I, therefore, find: (1) That there was such a contract entered into between the parties.   (2) That the plaintiffs performed their part thereof, after which the defendant, M. C. Smith, refused to perform her part thereof.

"It is, therefore, ordered and decreed, that Martha C. Smith, one of the defendants above named, be, and she is hereby, required to make, execute, and deliver to said lodge a proper fee simple deed of conveyance to the lot of land described in the complaint as amended by the referee.   It is further ordered that the plaintiffs have judgment against the defendants for the costs and disbursements in this action."

*Messrs. L. D. Jennings* and *A. S. Harby,* for appellant, cite: *As to laches on part of plaintiff:* 36 Cyc. 721-723; 53 S. C. 572; 7 Rich. Eq. 260; 21 S. C. 124; 2 Story Eq. Jur., pars. 749, 771, 776; 6 Works and D. 810; 31 S. C. 282. *Was there clear and convincing proof of the contract alleged in the complaint?* 31 S. C. 282; 29 S. C. 598; 94 S. C. 62; 32 S. C. 553; 7 Rich. Eq. 378; 77 S. C. 511; 101 S. C. 178. *Was W. S. Smith the agent of plaintiff in this particular transaction?* Story on Agency, par. 210; 2 Bay. 505; 69 S. C. 30; 50 S. C. 284; 43 S. C. 476; 63 N. J. L. 301; 51 Atl. 497; 86 S. C. 169; 167 N. Y. 375; 60 N. E. 649; 46 S. C. 426; 104 S. C. 522.   *Was the alleged contract within the*

*scope of Smith's apparent authority, or was it ever ratified?*
27 S. C. 621; 77 S. C. 511.

*Messrs. McLeod & Dennis* and *Thos. T. Tatum,* for respondents, cite: *As to the statute of frauds:* 61 S. C. 393; 79 S. C. 134. *As to agency:* 48 S. C. 430; 49 S. C. 345; 55 S. C. 568; 46 S. C. 37; 88 S. C. —; 86 S. C. 8.

June 11, 1918.

The opinion of the Court was delivered by Mr. CHIEF JUSTICE GARY.

The judgment of the Circuit Court is affirmed, for the reasons therein assigned.

MESSRS. JUSTICES HYDRICK, WATTS and GAGE concur.

MR. JUSTICE FRASER. I dissent. Mrs. Smith, the appellant, is the owner of a tract of land upon which was located a two-story building. The plaintiffs occupied the second story, as a Masonic hall, under a lease of 99 years, from a former owner of the land upon which it was built, and Mr. Smith used the first story as a warehouse. The building was out of repair, and repairs were necessary. Mrs. Smith was dissatisfied with the location, and wanted it moved farther from her dwelling house. A committee was appointed by the lodge to arrange for suitable quarters. Another lot on Mrs. Smith's land was selected, and a new two-story building erected, in part with the lumber of the old building, and in part with new lumber furnished by the lodge. The construction of the new building was paid for by the lodge. Mr. W. S. Smith, the husband of the appellant, was a member of the committee, and was also the manager of Mrs. Smith's property. After the new building was completed, the lodge occupied the second story, and Mr. Smith used the first story. There was no difference in the use of the two buildings; no new papers were drawn, and things went on for some years. Mr. Smith died, and the

respondents demanded a fee simple deed from Mrs. Smith for the land upon which the building was located. Mrs. Smith declined to execute the deed, and claims that it was a mere substitution of one location for another, and denied that she had ever agreed to give title.

I do not find in the case the evidence to support a finding adverse to Mrs. Smith. It is true that one witness said that Mrs. Smith said, "If we would move the house, we could have the whole thing." But this witness afterwards said that he had never talked with Mrs. Smith, and said his recollection as to the exact facts was not clear. Mr. White, one of the plaintiffs' witnesses, stated:

"Q. You put it where she wanted it? A. I had that to do. Q. You had that to do because the property was hers, and just built it where she authorized. I am sorry Mrs. Smith is not here. She could speak for herself. Mrs. Smith said more than the ground floor would be hers? A. That is what she said. Q. When was that, before the building put up, or when? A. That was before, while Mr. Smith was stepping off the land. Q. She said that land would be hers? A. I informed her of the fact that it would not be. Q. What did she say then? A. I do not know what all she did say. Q. Did she agree? A. We agreed that it would not be hers. Q. Did not ask her consent? A. No; not about that. Q. Did not care whether the lodge had it or not? A. I was sure the lodge would have it. Q. You did not care whether the lodge had her consent or not? A. All we wanted was the title Mr. Smith had promised to give. Q. You did not care whether she agreed or not? A. No; I did not care. Q. Were you personally present when Mr. Smith talked to his wife about this title? A. No. Q. Did you know if he ever talked to her? A. I do not."

Another witness for the plaintiff testified, also, that Mrs. Smith said that day that she would not give a deed. It is manifest that the committee depended on Mr. Smith and disregarded Mrs. Smith. Does the law disregard the express

notice of the owner and rely upon the promise of the agent in conflict therewith? The committee, representing the lodge, were told by Mrs. Smith, the owner, that they could not get the land. When the committee went to locate the land, Mr. Smith, who was not only his wife's general agent, but also a member of this committee, called Mrs. Smith to go along with the committee to locate the place for the new house. Plaintiffs' witness said: "She pointed out what lot, and Bill Smith had to agree, and the rest of us, too." Mrs. Smith also stated she would not give the title, and the Court would sustain her.

I do not see how there can be any question of estoppel, or contract to convey, or notice. The plaintiffs' witnesses say that on the day on which the new place was staked off, and before any work was done, Mrs. Smith notified them that she would not convey the fee, and would claim the land and the lower floor of the new building. That was followed up by actual possession of the new house in the same manner in which the old house had been used. It is manifest that the members of the lodge expected Mr. Smith to get a title for them; but it is equally manifest that he did not get it. The case shows that Mr. Smith was asked about the deed time and again, and put the matter off. One of the witnesses said: "W. S. Smith never said his wife agreed to a deed." I do not think the Court should decree a specific performance, when the owner gives notice that she will not convey, and the agent never even said she would. It is useless to give to a married woman the right to contract, and then allow her husband, over her protest, with full knowledge to the purchase, to make for her a binding contract to convey.

Besides all this, W. S. Smith, the one who was on the committee, and in the best position to know the facts, is dead. These things happened long before W. S. Smith died, and if no action was brought in his lifetime, I do not think a Court of equity should grant relief after his mouth is closed.

For these reasons I dissent.